Filed 10/27/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

---

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>R.T.,<br><br>    Defendant and Appellant. | A161973<br><br>(San Francisco County Super. Court No. JD18-3156)<br><br>**ORDER MODIFIYING OPINION AND DENYING PETITION FOR REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on September 29, 2021, be modified as follows:

1.    The first two full paragraphs on page 16, beginning "The agency had far less to say" and ending "exclusively during cross-examination," are deleted in their entirety and replaced with the following paragraphs:

> With respect to the relationship between mother and son, the agency reported only the following: "[J.D.] has a good relationship with his mother. [J.D.] and [mother] have been having virtual visits since March of 2020. However, because [mother's] family reunification services were terminated back in August of 2020, the Agency will be recommending ongoing virtual

1

visits, every other week, for 30 minutes. [C.J.] has agreed to supervise the virtual visits."

The section 366.26 hearing was conducted by video conference. Only the social worker, who had been assigned to the case for about the past year and a half, testified. Facts pertaining to the beneficial relationship exception were elicited exclusively during cross-examination.

2. The first full paragraph at page 24, beginning "Given the importance of this second stage of analysis," is deleted in its entirety and replaced with the following paragraph:

Given the importance of this second stage of analysis, "social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents taking into consideration the child's age, the portion of the child's life spent in parental custody, the positive or negative impact of interaction with the parent, and the child's particular needs as required by *Caden C.*" (*B.D.*, *supra*, 66 Cal.App.5th at p. 1230, fn. 5; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the nature and extent of the particular [parent-child] relationship should be apparent" by the time of the section 366.26 hearing because "[s]ocial workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court"].)

3. The second paragraph at page 32, beginning "Moreover, in evaluating the record" and which carries over to page 33, is deleted in its entirety and replaced with the following two paragraphs:

Moreover, in evaluating the record, we cannot overlook the fact the agency provided very little information in its prior reports during the case about the quality of mother's relationship with J.D. or even the nature of her interactions with him during visitation. That was not appropriate and did a disservice to not just mother and J.D. but also the juvenile court. Our colleagues in Division Four have aptly described the critical role that social workers play in our dependency scheme, and the objectivity they must bring to the task: " 'In addition to providing child welfare services to the family involved in a dependency proceeding,

2

the . . . social services agency provides essential information to the court.  At each stage of the dependency proceeding, the social services agency is statutorily mandated to prepare social study reports and make recommendations to assist the court.' " [Citation.]  The required reports in dependency proceedings vary by hearing, but in general they are all designed to make sure the court has the evidence before it to make the necessary findings at each stage of the proceeding. . . . [¶] In carrying out these functions the social worker has been likened to a prosecutor and thus is serving as an arm of the state in this regard, working in collaboration with others at the agency, including counsel. [Citations.]  But unlike counsel for the agency, social workers are not advocates in the adversarial sense.  Social workers make recommendations, but because their professional role is best described as that of a 'disinterested part[y],' their reports to the court must have the characteristics of 'objectivity and expertise.' [Citation.]  In fact, it is the recognized professional objectivity of social workers, and the 'trustworthiness' and 'reliability' of their work, that justifies the admissibility of their reports in dependency proceedings, despite the layers of hearsay these reports typically contain.  [Citation.]" (*In re B.D.* (2019) 35 Cal.App.5th 803, 821.)

To be clear, it was not the agency's burden to disprove the existence of the beneficial relationship exception—the burden of proof on this issue was squarely on mother. (See *Caden C.*, *supra*, 11 Cal.5th at p. 629.)  Moreover, there is tension in the caselaw concerning the extent to which the agency must address facts pertinent to the beneficial relationship exception in the section 366.26 report itself.  We express no opinion here about the adequacy of the agency's section 366.26 report.  (See § 366.22, subd. (c)(1)(B) [report must review "the amount and nature of any contact between the child and his or her parents . . . since the time of placement"], § 366.21, subd. (i)(1)(B) [same]; compare *B.D.*, *supra*, 66 Cal.App.5th at p. 1230, fn. 5 [post-*Caden C.* decision noting that "social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents" to assist court in examining whether parent-child exception applies] with *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344 [pre-*Caden C.* decision holding section 366.26 report need not "go beyond a general description of the post-placement contacts between

3

parent and child and into a detailed evaluation about whether the continuance of the relationship manifested by such contacts would be beneficial to the child"].) Our point here is that by the time the juvenile court scheduled the section 366.26 hearing, the agency's prior reports should already have provided objective, disinterested information about the quality of J.D.'s attachment to his mother, which would have assisted the court in evaluating the beneficial relationship exception when mother asserted it. (See *In re Autumn H.*, *supra*, 27 Cal.App.4th 567 at pp. 575-576; *Brandon C.*, *supra,* 71 Cal.App.4th at p. 1538 [evidentiary analysis concerning beneficial relationship exception that faults social services agency for failing to provide information about the quality of mother's visitation; "[i]ts reports consistently described the regularity of the visits, with no evaluation of their success"]; see also *B.D.*, *supra*, 66 Cal.App.5th at p. 1230, fn. 5.)

4.     The first sentence of the first paragraph at page 33, beginning "As *Caden C.* reflects," is modified to replace "parental bond" with "substantial, positive, emotional attachment" so that the sentence now reads:

As *Caden C.* reflects, the existence of a substantial, positive, emotional attachment is contextual.

5.     The first sentence of the second full paragraph at page 43, beginning "First, we are troubled by," is modified to add "the nature of J.D.'s relationship with mother reflected in the visitation logs and" after "given" so that the sentence now reads:

First, we are troubled by the agency's failure in the later stages of the case to consider guardianship as an alternative to adoption given the nature of J.D.'s relationship with mother reflected in the visitation logs and even C.J.'s desire that mother remain in J.D.'s life (an option the agency apparently was open to early on).

6.     The next sentence of the same paragraph at page 43, beginning "The social worker simply deferred to C.J.'s preference for adoption," is modified to add ", and did not even bother to read the visitation logs fully

4

when he recommended terminating mother's parental rights" after "without question" so that the sentence now reads:

> The social worker simply deferred to C.J.'s preference for adoption over guardianship, without question, and did not even bother to read the visitation logs fully when he recommended terminating mother's parental rights.

7.  Insert the following paragraph between the second and third full paragraphs on page 43, after the sentence "But it surely does not appear to have been the product of much deliberation.":

> In making this observation, we are not instructing the juvenile court on remand to select guardianship for J.D. over adoption. We also recognize that adoption rather than legal guardianship is statutorily preferred (see *Caden C., supra,* 11 Cal.5th at p. 631; § 366.26, subd. (b)) and that the burden of *proving* the beneficial relationship exception rests with the parent. But nothing in the statutory scheme requires the agency to abdicate its duty to objectively assess the facts when fashioning a recommendation to the court. The agency is not required to take the position that the beneficial relationship exception does not apply. In the end, of course, that decision is for the juvenile court. Here, it does not appear the agency ever seriously considered the beneficial relationship exception (and thus, by extension, the prospect of legal guardianship) despite compelling facts in its possession suggesting its potential applicability. (See *Amber M., supra,* 103 Cal.App.4th at p. 690 [criticizing "perfunctory" evaluation of mother's relationship with children that "instead focus[ed] on her current inability to provide a home for them and on the suitability of the current placements, perhaps swayed by [relatives'] qualifications and willingness to adopt and their refusal to consider guardianship or any other permanent plan"].) We remand for the juvenile court to consider that issue anew in light of *Caden C.*

8.  Insert "Second," at the beginning of the third full paragraph at page 43, beginning "We also note that," so that the paragraph's first sentence now reads:

Second, we also note that some of the agency's later criticisms of mother stemmed from the fact she sometimes mentioned her financial pressures to J.D.

These modifications do not effect a change of the judgment.

The petition for rehearing is denied.


Dated: _____          __Kline_____, P.J.

Trial Court: San Francisco County Superior Court

Trial Judge:          Hon. Susan M. Breall

Counsel:

Rachel Belden and Amy Grigsby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dennis J. Herrera, City Attorney, Kimiko Burton, Deputy City Attorney; Gordon-Creed, Kelley Holl and Sugerman, Jeremy Sugerman, for Plaintiff and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>R.T.,<br><br>       Defendant and Appellant. | A161973<br><br>(San Francisco County Super. Court No. JD18-3156) |

R.T., the young mother of now six-year-old J.D., appeals an order terminating her parental rights, entered after she was unable to overcome parenting struggles that were the byproduct of a damaged childhood spent in foster care, without the care and comfort of parents herself. She contends the juvenile court abused its discretion in declining to apply the beneficial relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).[1]

After the appellant's opening brief was filed, the California Supreme Court decided *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which clarified how that exception must be applied. As we will explain, we cannot determine on this record that the juvenile court's ruling complied with the principles announced in the Supreme Court's decision. Although we

---

[1] All statutory references are to the Welfare and Institutions Code.

recognize it is in J.D.'s interest to expeditiously select his permanent plan, the interests at stake when parental rights are terminated are of the utmost importance to both parent and child, and proper consideration of the factors deemed relevant by our dependency scheme is vital. Accordingly, to ensure the juvenile court properly discharges that task, we will reverse the order terminating parental rights and remand this matter for a new section 366.26 hearing in light of the legal standards articulated in *Caden C.*

## BACKGROUND

### A. The Initiation of This Case

On July 7, 2018, shortly before turning three years old, J.D. was removed from his mother's custody following two violent altercations in his presence, one of which seriously injured his six-month-old half-sister, R.G. The first was an argument between mother and R.G.'s father that took place when the two encountered each other on a train platform; their argument escalated into a physical struggle while mother was holding her baby girl (each accusing the other of being the aggressor), and it culminated with J.D. either falling or getting pushed to the ground near the edge of the train platform as a train approached. Mother reached down to grab him just as the train whizzed by. The second incident occurred a few days later. That time, after another child hit J.D., mother had a physical fight with the child's father (J.D.'s uncle), again while holding her baby daughter (and again, the two adults accused each other of being the aggressor), and mother accidentally dropped her daughter. The baby was transported to the hospital and later diagnosed with a skull fracture of undetermined cause (according to the attending physician, it was possibly pre-existing). This second fight precipitated a 911 call to police by mother which, in turn, resulted in her own arrest for an injury to the uncle's arm, a referral to child welfare authorities,

2

and the commencement of this case by the San Francisco Human Services Agency (the agency).[2]

J.D. and his baby sister were ordered detained and placed in foster care, with mother granted supervised visitation.[3] The court also issued a temporary restraining order protecting mother and the two children from J.D.'s uncle.[4] Mother already had secured a restraining order against R.G.'s father.

Thereafter, the juvenile court sustained amended allegations (in September 2018) that mother failed to protect J.D. based on the two fighting incidents (§ 300, subd. (b)(1)) and that her relationship with her daughter's father was characterized by domestic conflict. The court also sustained allegations that J.D. was left without support (§ 300, subd. (g)), because his father was incarcerated and unable to care for him. The court bypassed services for J.D.'s incarcerated father and ordered reunification services for mother.[5]

Shortly thereafter, about three months into the case, in October 2018, the two children were removed from their initial foster home and placed with

---

[2] The record does not reflect she was ever charged in connection with the incident.

[3] J.D.'s little sister would go on to spend more than a year and a half in foster care with J.D., until sometime in early 2020. Eventually she reunited with her own father, and her dependency case closed sometime in the fall of 2020. The record does not reflect the precise date it closed, nor the date she returned to her father's actual physical custody.

[4] Later after a settlement conference, mother withdrew her request for a more permanent restraining order against the uncle.

[5] The parental rights of J.D.'s father ultimately were terminated and are not at issue in this appeal.

3

C.J., a relative of mother's who is variously identified in the record as her aunt or cousin.

Mother, herself a product of California's foster care system, had been cared for by C.J. for part of her childhood. According to agency records, mother had been detained at birth and soon thereafter abandoned by her own mother. Mother did not want to talk about the details but reported she had been in foster care all her life. She lived with C.J. from the time she was one year old until early in her adolescence, when she was sent to live in a series of foster homes and group homes after acting out and displaying sexual behaviors. She first got pregnant at age 15.[6] J.D. was born on her 19th birthday. Later, she tried without success to get her foster care extended from age 18 to age 21. By the time this case began, mother was almost 22 years old and homeless, couch surfing among the homes of acquaintances and relatives in San Francisco and Vallejo. Her relationships with the fathers of her two children and some of the fathers' relatives (with whom she sometimes lived) were turbulent, chaotic and sometimes physically violent.[7] She had been arrested for carrying a deadly weapon (brass knuckles, although no charges were pursued), which she said she carried for protection because she felt unsafe in the homes of her former boyfriends' relatives where she had been living.

---

[6] The record does not reflect whether her pregnancy was carried to term, but the only reasonable inference is that she did not have a child or else that fact would have been noted as part of her family history in the agency's various reports.

[7] For example, mother reported having been the victim of physical violence by several extended relatives of her daughter's father, including having been "jumped" several times. One time she secured a restraining order against one of them after receiving a gash to her face while on her way to pick up her children.

## B. Mother's Progress During the First Two Review Periods (September 2018 to September 2019)

Mother received close to two years of reunification services , a period marked by periodic conflict with the children's caregivers and recurring angry episodes.

Initially, there was conflict between mother and C.J., culminating with C.J. refusing after several weeks to allow mother to have in-home visits with the children.[8] But matters were resolved, and C.J. continued to supervise mother's weekly visits in her home.

About eight months later, there were additional problems. On June 6, 2019, mother encountered R.G.'s father in public after he had picked up R.G. for a visit. An argument ensued and escalated, and he hit mother. Police were called, and a bystander said mother had antagonized R.G.'s father by trying to block his way and take R.G. from him. Two days later, mother got into an argument with C.J., claiming she'd been approved for an overnight visit; when C.J. refused to allow her to take the children on the unauthorized visit, mother threatened her in front of the children and became so belligerent that C.J. called police to de-escalate the situation and get mother to leave. The next day, mother posted derogatory and threatening messages about C.J. on social media.

Despite these incidents, mother made significant progress toward reunification during the first two review periods (after 6 months and 12

---

[8] According to an October 29, 2018 addendum report, mother frequently fought with other relatives in the home and threatened C.J. and C.J.'s children on social media. Mother also undermined C.J.'s efforts to provide structure and parenting to J.D., which caused him to act out rebelliously. Mother wanted the children removed from C.J.'s home, claiming she was unfit, but the agency believed the children were doing well in her care and that mother's claims were unfounded.

months). She progressed to unsupervised visitation after about five months (in February 2019), and about a year into the case (in August 2019), the court authorized overnight visits. In its 12-month report (prepared on August 12, 2019), the agency reported that reunification was "very likely," and anticipated soon increasing mother's visitation further and formulating a plan to transition the children to return to her home. By this time, mother had moved into a transitional housing program and was hoping to find permanent housing, was attending weekly individual therapy sessions and reportedly progressing with her goals. She had completed her parenting classes and had been staying away from R.G.'s father. The agency reported that mother had been working hard and was consistently engaged in her reunification services.

One weekend in early September 2019, however, about a week before the scheduled 12-month review hearing, mother harassed and threatened R.G.'s father in a fit of anger, prompting him to get a restraining order. The court continued the 12-month status review hearing by two weeks and suspended her overnight visits in the meantime.

The next day, mother enrolled herself in an anger management support group. At a family team meeting a week later, she acknowledged that she had an anger management problem and that her behavior was wrong, was very apologetic, agreed to participate in additional domestic violence support services as well as the anger management group and expressed remorse for her actions. By this point, mother's relationship with C.J. was cordial again.

At the continued 12-month hearing held on September 26, 2019, the court ordered mother to participate in the additional anger management/domestic violence services, gave the agency discretion to resume mother's overnight visitation, and ordered additional reunification services.

At this juncture, the agency was considering guardianship as one possible permanent plan.  At six months, it had reported that if the family failed to reunify, the concurrent plan was adoption or legal guardianship, and it did not revise or revisit that recommendation in its 12-month report.

**C.  The Final Review Period (October 2019 to August 2020)**

After the September 2019 incident that derailed what had appeared to be a slow march toward reunification, mother continued to struggle with erratic and angry behavior for another six months, until around March 2020.

In October 2019, she posted more threatening comments about C.J. on social media and, at some point, threatened to report C.J. to the agency.  A couple of weeks after the social media posts, J.D. returned from a visit with mother with an accidental cut on his cheek, and he told C.J. that mother had told him to blame it on mother's sister, who helped C.J. care for the children, and to say she had socked him in the face.  The sister reported that mother had asked her to transport marijuana to mother in R.G.'s diaper bag (mother denied this).  On November 7, 2019, the agency received a hotline tip that C.J. was neglecting and physically abusing J.D.  The agency investigated the report, C.J. told the agency mother had coached J.D. to say he had been hit, and the agency deemed the results of its investigation to be "inconclusive."

Over a period of several weeks around late November 2019, mother posted videos on social media of herself with the children that caused the agency concern.  In one, she made a snide comment to R.G. about R.G.'s father (telling the child, "I know, baby," when the child told her the child hadn't enjoyed a visit with him).  She posted another video of J.D. pretending to shoot a toy water gun, that included text referring to "dropping n. . . s all 2020 and the rest of 2019"; she can be heard in the background laughing, saying something about shooting.  The agency later described the video as

indicating mother appeared to be encouraging J.D. to hold a toy gun like he was going to shoot someone.

In early December 2019, citing these videos and threats made to C.J., the agency asked the juvenile court to require that mother's visitation be supervised on an emergency basis, pending a hearing on an as-yet-unfiled JV-180 petition to make the modification permanent. The court (on December 9) denied the agency's request, but prohibited any more informal meetings between mother and the "caretakers for mother's visitation with the [children]," ordered mother to refrain from posting about the children on social media, and ordered her to refrain from engaging in "any kind" of harassment of C.J.[9] The same day, the agency showed mother's therapist several of her social media posts and the therapist said they were disturbing, and quite different than what mother had led her to believe. On December 16, C.J. obtained a stay-away order protecting her from mother.

By the time the agency filed its status report for the upcoming 18-month review hearing on December 26, 2019, mother was subject to restraining orders protecting R.G.'s father and C.J. C.J. felt threatened by mother and expressed worry about her "explosive temper" and its impact on the children. The agency, C.J. and J.D.'s attorney all were worried mother used very poor judgment and was using the children to get back at people with whom she was angry. And the agency concluded that mother "can parent on occasion but . . . her level of maturity and rage interferes with her being able to put the needs of the children first and to consistently ensure her

---

[9] At this point, J.D.'s toddler sister R.G. was still living with him in foster care in C.J.'s home but her father had progressed to unsupervised extended overnight visits.

children's emotional and mental needs for safety are met." The agency thus recommended terminating mother's reunification services.

Thereafter, the 18-month review hearing, originally scheduled to take place in January 2020, was twice continued (once, due to the appointment of new counsel for mother, and then due to the COVID pandemic) for a total of about seven months, until August 28, 2020. In the meanwhile, mother continued to display erratic and troubling behavior.

In early 2020, a staff member at J.D.'s daycare overheard J.D. blurt out a derogatory comment about his caregiver ("Mommy said [C.J.] is a fat bitch"). Then on March 3, the agency received a second anonymous hotline tip accusing C.J. of neglect and physical abuse, days after mother had posted threats on social media that C.J. was going to get in trouble and lose custody of "her" children.[10] This was the last time the record reflects that mother posted anything objectionable or inappropriate on social media for the duration of the case. An agency staff member met with C.J. to investigate the complaint, and within days (on March 6) the referral was closed as unfounded.

The investigator's interview with C.J. in early March 2020 revealed some new information. According to C.J., J.D. had said a few times at school and at home, "[C.J.] is a bitch," and that "my mommy says that." C.J. also reported that J.D. was hitting another child in his daycare program but his behavior was improving with support and adult intervention.

On March 24, 2020, mother's in-person visits were suspended pursuant to emergency orders issued in response to the global COVID pandemic. The

_____

[10] It is unclear whether the threat referred to J.D. and his baby sister, or to the other children living in C.J.'s household (three of her grandchildren and a nine-year-old daughter).

agency arranged for her to have virtual visits and telephone calls with her children instead, supervised by agency staff.

On June 23, 2020, mother's therapist reported to the agency, among other developments, that mother had been diagnosed with Post Traumatic Stress Disorder and had made significant progress on decreasing her anger and controlling her impulses through individual therapy and targeted anger management classes. Her therapist discussed the gravity of mother's past trauma and the importance of mother trying to process it and work through her past experiences, in order to become a better parent, decrease her anger and repair family relationships. She reported that mother "continues to grow in her ability to make [*sic*] her children's perspective into account which is an important skill in positive parenting."

The therapist's letter also noted that mother and her children "had a strong affectionate relationship," and that the lack of in-person visitation had been hard on mother, "and I am sure that it has been [hard] on her children as well." Her therapist also said that in their sessions they "continue to discuss parenting in the context of child development as [well] as other topics (discipline, etc.) [that] are hard to do when she isn't seeing her children. For example, we discuss attention span and interactions that might work well over Zoom."

In late July 2020, mother filed a JV-180 petition asking that the pandemic-related suspension of her in-person visits be lifted so she could visit her children in person. She alleged the agency had refused to allow her to resume in-person visitation after re-opening operations following shelter-in-place orders, telling her only that in-person visitation would confuse the children. Mother based her request on an emergency rule of court promulgated by the Judicial Council that required the agency to balance

10

public health concerns against a child's best interest in deciding whether to change the manner of her previously authorized visitation during the pandemic and entitling her to a hearing on any such change (see Cal. Rules of Court, Emergency rule 6(c)(7), adopted April 6, 2020). The agency opposed mother's request because of a comment the agency found inappropriate (she "had said something to the degree" that J.D. should not worry because they would be reuniting soon), and because C.J. was concerned about contracting coronavirus from in-person visits. The court set mother's request for a hearing, and it was heard on the same date as the contested 18-month review hearing.[11]

In a subsequent addendum report (filed August 25, 2020), the agency provided additional details about its refusal to allow mother in-person visitation. The agency acknowledged it was allowing in-person visitation in other cases "depending on the level of risk and safety to the parties involved." But it had met with C.J., to discuss the subject three times in the past three months—in person—and she was adamantly opposed to letting mother have any in-person contact because of potential health risks to her and the members of her household. The social worker also doubted that mother had been sheltering in place since the start of the pandemic, despite mother's claim she had been doing so, because mother was not home one day in June when the social worker had tried to schedule a home visit with her.

On August 20, 2020, mother's therapist, who had been working with mother for two years, reported that mother was continuing to work with her anger management specialist and that, through therapy and targeted anger classes, she had learned techniques to keep her anger under control which

---

[11] The record does not reflect a ruling on mother's JV-180 petition which presumably was denied.

had become "almost second nature," and she was using them as needed. She also reported that mother was progressing in dealing with her past trauma; she continued to reflect on incidents from her past, was better able to start "letting things go," and had been talking about forgiveness. And, in therapy, mother had done a great deal of reflecting on her past behaviors with regard to domestic violence, was aware some of her past actions were "unacceptable," and had focused discussions in therapy to ensure a safe transfer of her daughter to her daughter's father at the conclusion of R.G.'s dependency case.[12]

On August 24, 2020, four days before the continued 18-month review hearing, the social worker and J.D.'s counsel met with J.D. in C.J.'s home. C.J. reported that when J.D. gets in trouble, he says "my mommy says I don't have to listen." J.D.'s attorney asked J.D. where he wanted to live, and he responded, "I want to be [C.J.'s] son." J.D.'s attorney also asked him what type of things mother tells him to say, and he responded, "bad words" and "not to listen to people."[13] He also was asked if he remembered the video mother made in which he held a toy gun and whether he thought it was a good or bad idea, and he responded with "bad idea."

In its August 25, 2020 addendum report prepared for the 18-month review hearing, which was the first case status review update in eight

_____

[12] As noted, the record does not reflect precisely when R.G.'s dependency terminated, but the agency's report for the section 366.26 hearing indicates J.D. continued to see his sister even after she went to live with her father, during virtual visits with mother.

[13] The timing of mother's comments to J.D. is unclear. Although he disclosed them in the August 24 meeting, mother's visitation had been supervised by the agency since late March, with the start of the pandemic, and the agency never reported any such concerns with mother's visitation by the staff member who observed her interactions with J.D.

12

months, the agency did not discuss the quality of mother's visits with her children during the past eight months other than to note "several concerns" about her virtual visits. It cited four comments during that time from the visitation notes, in which mother alluded to the possibility of the children returning home to her and/or to her financial situation.[14] Based upon these comments, the agency concluded the following: "the mother has repeatedly been told not to talk to the children about where they might leave [*sic*] or [when they might be] coming home. She has also been asked not to make them worry about money or paying bills. It was explained to the mother that this could be confusing to them and could cause them distress yet she continues. Additionally, mother's statements call into question, whether she has in fact benefited from her therapy and parenting class as it does not appear she knows what an age appropriate conversations[*sic*]." The agency continued to be concerned that J.D. was being "coached" by mother, and was worried mother was trying to use J.D. as a pawn to act out her anger towards J.D.'s "caregiver and potential legal guardian." The agency also noted that mother's relationship with C.J. had become "weaker" since the last reporting period. The report also noted that, at some unspecified time, mother had used one of her children's social security numbers to get a credit card so she could get cable television.

---

[14] According to the visitation notes, on April 1, mother "mention[ed] to [J.D.] to pray for him and his sister to be able to come to live with mommy, in Jesus name Amen." On April 5, "During the prayer [mother] mentioned about her, [J.D.], and [R.G.] coming home to stay with her." On April 13, mother "talked with [R.G.] about her needing help with her rent and bills and ask her if she gonna help her" which prompted the visitation monitor to comment in the log, "maybe the conversation was just in fun but not appropriate for a 2-year-old." Then on May 5, mother "talk[ed] about she needs to go pay her bills and asked [J.D.] was he paying the bills" and he told her, "I'm paying the bills."

The agency reported that mother's case manager from her domestic violence/anger management support group confirmed mother had regularly and consistently been attending the group since September 2019 (and had been having weekly or other ad hoc check-ins with the case manager), had been working hard, and had made great progress, and the case manager reported she had "no concerns" about mother's participation in the group. The agency also included in its report the two letters from mother's therapist discussed above (from June and August 2020), reporting on her progress toward managing her anger and healing from a lifetime of trauma. In addition, mother had been complying with the restraining order preventing her from harassing R.G.'s father, and there had been no further incidents between them.

The agency concluded that "[a]lthough the mother has completed many of her services over the past almost 2 years, her behaviors above and over the last 18 months suggest that she is not benefiting from them. Of the most concern is that she continues to use [J.D.] as a pawn to get back at her former foster mother/[J.D.]'s caregiver without regard to how it will impact [J.D.]." The social worker acknowledged "that the mother cares about both her children" but, despite nearly two years of services, had not been able to parent them appropriately on an ongoing and consistent basis, lacked insight, and was unable to prioritize her children's needs. The social worker acknowledged that mother's therapist had "very good feedback and things to say about [mother's] progress and behavior," but noted that mother's behavior "over the last two years has been very concerning." He wrote that "she has not shown a change in her behavior since the beginning of this dependency." The report noted C.J.'s continued interest in providing J.D. a

14

permanent home and her excellent care of him, and the agency continued to recommend terminating mother's reunification services.

The juvenile court adopted the agency's recommendation at the 18-month review hearing held on August 28, 2020, and set the matter for a permanent planning hearing (§ 366.26). Mother did not challenge that ruling.

## C. The Termination of Mother's Parental Rights

The contested section 366.26 hearing took place five months later, on January 15, 2021. In the meantime, mother continued to visit regularly with J.D. for 30 minutes every week (and sometimes more frequently) through video calls.

In its report for the hearing (prepared on November 19, 2019) (see § 366.22, subd. (c)(1)), the agency recommended terminating mother's parental rights to free him for adoption by C.J. The agency expressed no concerns about C.J. as a potential adoptive parent, described her as one of J.D.'s two "closest adult connections" (the other being mother's sister), and reported favorably about the stable, loving home she had provided him for two years that was meeting all his needs. J.D. was no longer displaying any concerning behaviors, was (according to C.J.) doing "great," was always happy and healthy around her, and had developed a strong relationship with her.

The report also depicted something of a thawing between mother and C.J., although not a total repair. It said their relationship had been very good until the dependency case began, had deteriorated "for several months" during the case, but now was cordial. It also said that C.J. "knows that [mother] is [J.D.'s] mother and wants him to have a decent relationship with her." But it reported that C.J. "still" did not want any direct contact between

15

herself and mother and, although she was willing to allow virtual visits to continue, she also did not want mother to have any in-person visits with J.D. for reasons that were not explained.  It reported that C.J. "has been very committed to providing *any* type of permanent plan to [J.D.] for several months now" (italics added), and emphasized at the end of its report (for a second time) "how important it is for J.D. that [C.J.] and [mother] have been able to be cordial with each other the last few months," and that C.J. "completely understands that [mother] is [J.D.]'s mother, and wants her to be a part of his life growing up."

The agency had far less to say in its report about mother than about C.J.  It reported that mother's virtual visits had been continuing but said nothing about their content or quality.  And on the subject of the relationship between mother and son it said only the following:  "[J.D.] has a good relationship with his mother.  [J.D.] and [mother] have been having virtual visits since March of 2020.  However, because [mother's] family reunification services were terminated back in August of 2020, the Agency will be recommending ongoing virtual visits, every other week, for 30 minutes.  [C.J.] has agreed to supervise the virtual visits."

The section 366.26 hearing was conducted by video conference.  Only the social worker, who had been assigned to the case for about the past year and a half, testified.  His direct examination was brief and touched only on the subject of J.D.'s adoptability by C.J.  Facts pertaining to the beneficial relationship exception were elicited exclusively during cross-examination.

The social worker confirmed it was still true, as was reported in the section 366.26 report, that C.J. acknowledged mother is J.D.'s mother and C.J. wanted mother to remain involved in J.D.'s life, and he testified that C.J.

16

made it clear during their monthly meetings she wants J.D. to continue to have a relationship with his mother.

He was also cross-examined about various references to guardianship in the section 366.26 report (including one stating "guardianship is recommended for this hearing"), which he testified were errors, and testified he had discussed both guardianship and adoption with C.J. but did not consider guardianship as a permanent plan, because C.J. "preferred adoption" for reasons she did not explain.

The social worker confirmed that mother had been having regular visits with J.D. since the termination of her reunification services, supervised by the agency. He also testified that J.D.'s half-sister, R.G., who had been living with her father for more than a year, saw her brother during those visits, which were taking place about once or twice a week.

Mother's counsel introduced a log of visitation notes from the period beginning in September 2020 after mother's reunification services ended. That document, 21 pages in length, contains detailed, single-spaced digests of about 20 visits that took place in the roughly four-month period ending December 29, 2020. The social worker testified he had read "some" but not all of the log and had not reviewed it "extensively." But he had relied on it and considered what took place during the visits in recommending adoption for J.D. We discuss the visitation log in greater detail, *infra*.

Mother's counsel cross-examined the social worker about mother's visitation briefly, over frequent objections. He admitted that during one visit (on September 22, in which J.D. was noted to be crying), J.D. was upset about not being able to come home to see his mother. He admitted that in two other visits (on October 1 and December 15), J.D. was asking to go to mother's house, in one of which he asked her about it three times, in three

different ways. The social worker also admitted that J.D. looks forwards to his visits with mother ("I'm assuming so"). He also testified that C.J. reported that J.D. would sometimes "act[] up" after his visits with mother which was concerning but he admitted he never tried to find out why.

He testified J.D. refers to C.J. as "grandma," not "mother" and that J.D. refers to mother as his "mom."

The social worker's testimony revealed he had never asked J.D. how the child felt about being separated from his mother. He admitted that in their last meeting together, he didn't ask J.D. how he felt about not living with his mother, nor about why he cried about not being able to go home with his mother during their September 22, 2020 visit. He also admitted he had never asked J.D. if he was unhappy, sad or feeling emotional about not being with his mother.[15]

On cross-examination by J.D.'s counsel, the social worker testified that part of the reason for the past "up and down" relationship between mother and C.J. was because of mother's past threats and inappropriate behavior toward C.J. He testified that J.D. has expressed that he wants to remain permanently in C.J.'s home and that C.J. is "the parental figure" in his life. He also testified that the agency had been concerned about mother's contact with J.D. throughout the case, and that mother's visits had been supervised

---

[15] On redirect examination, he was asked if it was "developmentally appropriate" to ask a five year old whether or not it is sad for him to not live with his mother, to which he responded, "I would say no." No basis for that opinion was given, and on re-cross-examination mother's counsel was precluded from examining him about whether it was possible to discuss the subject in an "age-appropriate manner" (on the ground it assumed facts not in evidence). Counsel did, however, elicit his admission that he was never able to get any information from J.D. about J.D.'s feelings about his mother, or about living in mother's home.

for quite some time because of those concerns. The concerns "[m]ainly" were that mother had been told not to tell J.D. "that he's coming home soon or about the court stuff" and instead to "keep things general and positive," but that "over time [mother] has had trouble following these directions, and she's still from time to time bringing these issues up during the virtual visits."[16]

Following argument, the juvenile court terminated mother's parental rights. The court made few explicit factual findings concerning the parental benefit exception. It acknowledged J.D. has a relationship with mother and that it is a positive one. But it found their relationship did not "amount to [a] parental bond" and that "severing the relationship that does exist would not be so detrimental as to outweigh permanency for [J.D.]." The court designated C.J. the prospective adoptive parent, and this timely appeal followed.

## DISCUSSION

## I.

### *General Legal Principles*

The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).) At that stage, "the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child." (*In re Marilyn H.,* at p. 305.) The dependency statutes embody a presumptive rule that, after reunification efforts have failed, parental rights must be terminated in order to free a child for

---

[16] There is no evidence of mother engaging in any such comments in the nearly four months of visitation logs during the period after her reunification services were terminated that were entered into evidence.

19

adoption. (*Caden C., supra*, at 11 Cal.5th at pp. 630-631.) However, the statutes provide an exception where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

In *Caden C.*, the Supreme Court for the first time addressed this statutory exception in a wide-ranging opinion that clarified its scope, disapproved a series of decisions that took too restrictive an approach to it (*Caden C., supra,* 11 Cal.5th at p. 636, fn. 5; *id.* at p. 637, fn. 6; *id.* at p. 638, fn. 7), and, among other things, cited favorably an appellate decision applying the exception that had long been relegated to the status of an outlier, confined to its "extraordinary" facts. (See *id.* at pp. 632, 633, citing *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*); see also, e.g., *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1302-1303 [discussing and distinguishing *S.B.*], disapproved in *Caden C.*, at pp. 637, fn. 6., 638, fn. 7.)

The Supreme Court clarified, among other points, that the beneficial relationship exception has three elements. (*Caden C., supra*, 11 Cal.5th at p. 631.) As summarized in *Caden C.*, "the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental

20

rights, and the court should select a permanent plan other than adoption." (*Id.* at pp. 636-637.) The court discussed each of the elements in some depth, which we will do as necessary below.

*Caden C.* also held that a parent's inability to overcome the issues that led to the dependency is not a categorical bar to applying the exception, because such a principle would be "paradoxical" and "would effectively write the exception out of the statute." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) But neither is it irrelevant. A parent's continued struggles with such issues "are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.) And the court explained that, in any given case, evidence of such matters could cut either way. "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child," while "[c]onversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" . . . effect' on them." (*Id.* at pp. 637-638.)

Finally, *Caden C.* clarified the standard of review we are to apply in reviewing the juvenile court's ruling. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) The first two elements are reviewed for substantial evidence, because a determination as to whether a parent has consistently visited and maintained contact with the child to the extent permitted by court orders "is essentially a factual determination," as is the question whether the relationship is such that the child would benefit from continuing it. (*Id.* at pp. 639-640.)

The question whether termination of parental rights would be detrimental to the child, however, is more nuanced. That issue entails "a

21

series of factual determinations" that are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be." (*Ibid.*) They may also include a determination as to "how a prospective adoptive placement may offset and even counterbalance those harms," which in turn may rest on "explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Ibid.*) The court's *weighing* of the relative harms and benefits of terminating parental rights (and hence, its ultimate decision), which reflects "a delicate balancing of these [factual] determinations," is reviewed for abuse of discretion. (*Ibid.*) The Supreme Court explained, however, that there will likely be very little difference between these standards of review in practical application. (*Id.* at p. 641.) The reason is because "the hybrid" standard of review it announced, "[a]t its core[,] . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' "

## II.

### *Analysis*

Here, the first element, regular visitation and contact, is not in dispute. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) The agency concedes mother satisfied this element. Our focus here is on the second and third elements.

Mother argues that she satisfied both the second and third elements and, at a minimum, that the juvenile court's error in finding she did not

prove the existence of a beneficial relationship (the second element) infects with error its weighing of relative harms and benefits (the third element). "Having erroneously concluded that no parental bond existed at all in this case," she contends, "the juvenile court cannot have balanced the benefit of that relationship against the benefits of adoption."

The agency asserts that mother proved neither the second or third elements as a matter of law, and therefore that the court's decision was well within its discretion.

As we will explain, we do not agree entirely with either party. But we conclude that the juvenile court's ruling cannot be affirmed on this record, because we cannot be certain the juvenile court did not consider factors disapproved of in *Caden C.* Accordingly, a remand is necessary. (See *In re B.D.* (2021) 66 Cal.App.5th 1218, 1222, 1231 (*B.D.*) [doing same].)

### A.    A Beneficial Relationship

The second element of the beneficial relationship exception requires courts to "assess whether 'the child would benefit from continuing the relationship.' " (*Caden C., supra*, 11 Cal.5th at p. 632, quoting § 366.26, subd. (c)(1)(B)(i).) In other words, "[t]he parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.,* at p. 636.) The Supreme Court noted that here, "the focus is on the child." (*Id.* at p. 632.) It explained that a "slew of factors" may bear on this issue, such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*.) In conducting this assessment, "courts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]

23

Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Ibid*.) " 'Parenting styles and relationships differ greatly between families,' " and therefore, the court emphasized, "[c]ertainly, it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Ibid*.)

Given the importance of this second stage of analysis, "social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents taking into consideration the child's age, the portion of the child's life spent in parental custody, the positive or negative impact of interaction with the parent, and the child's particular needs as required by *Caden C*." (*B.D.*, *supra*, 66 Cal.App.5th at p. 1230, fn. 5.) Indeed, "[t]he need for objective reporting from the social welfare agency is nowhere more important than at the permanency planning hearing under section 366.26." (*In re B.D.* (2019) 35 Cal.App.5th 803, 822; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576 ["the nature and extent of the particular [parent-child] relationship should be apparent" by the time of the section 366.26 hearing because "[s]ocial workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court"].)

Here, mother presented evidence to support a finding that J.D. has a "substantial, positive, emotional attachment" to her sufficient to meet the second element. J.D. was almost five and a half years old when the juvenile court terminated mother's parental rights and had lived with mother for just

24

over half of his life, until nearly age three.  Although the status reports prepared in this case are sparse in information about the quality and strength of J.D.'s attachment to his mother, there are indications he was clearly bonded to her when removed from her custody.  According to the detention report (prepared about one month into the case), mother reported the children had begun to act differently toward her, and that J.D. appeared angry at her, kept crying and blamed her for his not being able to return home.  J.D.'s first foster parent also reported that J.D. would become "a little dysregulated" after his visits but would "calm[] down" after his bath.

Further, there is abundant evidence that J.D.'s attachment to mother continued throughout the case, despite the fact that, due to the pandemic, she had no in-person visitation with him for the last 10 months of the case.

First, the agency's written reports consistently describe J.D.'s attitude *toward* mother in a positive light, even though the reports noted examples of mother's inappropriate behavior.  For example, in the 12-month review report, the social worker relayed his personal impression, based on first-hand observations, that mother was "always appropriate and affectionate" with her children and the children "appear very happy and comfortable with [her]." The report also included feedback from the therapist, who had begun family therapy with mother and her two children and reported after eight sessions that "[t]he three of them appear to have a positive and affectionate relationship."  The therapist praised some of mother's parenting skills, observing she is "very good at balancing her attention and each of their needs" and "has good and appropriate discipline skills, and . . . is good at intuiting why they may be acting a certain way."  The therapist also noted that the sessions were "starting to address all of their feelings around the separation and will continue to work on this as issues come up and the[]

25

children are more comfortable." In that report, the agency thus recommended the weekly family therapy continue "in order to strengthen their relationship, and cope with the fact that they have been separated for over one year now." The 18-month review report (prepared in late December 2019), though it detailed a number of problematic incidents, contained similar affirmations from the family therapist, who stated that, after 20 sessions, "[t]he family continues to demonstrate an affectionate relationship." The same report also said C.J. reported that "the children come back from their visit[s] happy." And in the section 366.26 report, the agency stated that J.D. had a "good relationship with his mother."

What is more, even C.J., who lived with J.D. for more than two years and observed much of the visitation, acknowledged the positive bond J.D. had with mother, despite her own fraught relationship with mother. By the time of the section 366.26 hearing, she told the agency she "completely understands that [mother] is J.D.'s mother." And although C.J. herself wanted no contact with mother, she "wants [mother] to be part of his life growing up." Her views as J.D.'s caretaker, while not dispositive, " 'attest[] to the significance of the bond between mother and son' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632) because she was surely in a position to see it.

And then there are the virtual visitation logs mother introduced into evidence. Many of the entries are intimate, personal and touching. It is hard to do justice to the picture that emerges from them; neither space nor words suffice, much in the way that even the most thorough exposition of a photograph necessarily would fail to capture its detail, nuance and emotional depth. But the logs, which read almost like a verbatim transcript of what transpired, provide an extremely telling glimpse of how J.D. "feel[s] about, interact[s] with, look[s] to, [and] talk[s] about" his mother. (*Caden C.*, *supra*,

11 Cal.5th at p. 632.)

The logs show, first, that mother consistently and repeatedly acted in parental role toward J.D. during their visits.  Indeed, the agency concedes she "offered support and positive encouragement" during their visits and "acted appropriately" in them.  But the logs show much more.  Mother's love and affection for her son are evident in every visit (frequently telling him she loved him, for example, and sometimes even calling him by a nickname).[17]  She also comforted him.[18]  She apologized to him for her mistakes and for those of his father, assured him he was loved by his father, and told him his father also was sorry (for making "bad mistakes.")  She frequently encouraged him—to learn as much as he could in school, to be good, and to

---

[17]  To be clear, we by no means suggest that a parent's love alone suffices to establish the exception overall; it does not.  (See, e.g., *In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)  As *Caden C.* emphasizes, the focus here must be on the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  But a parent's expressions of love and affection are relevant to assessing the nature of the parent/child bond.  (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 230 [holding this element satisfied as a matter of law].)  And that is particularly true here in assessing the visitation log.  Mother's expressions of love to J.D. during their visits together provide context for the overall quality and nature of their interactions reflected in that documentary record of their visitation.

[18]  For example, on one occasion when J.D. told her that "Black Panther" had died (a reference to the recent death of the actor who portrayed the first African-American superhero in a major motion picture), she told him "that Black Panther lives in him and he can be like Black Panther too."  (See Ugwu, *"Black Panther" Star Chadwick Boseman Dies of Cancer at 43*, N.Y. Times (August 28, 2020), available at <https://www.nytimes.com/2020/08/28/movies/chadwick-boseman-dead.html>.)

Another time, when J.D. was sad about not being able spend time at her house, the log says she "trie[d] to reassure him it will be okay," and told him "Just remember to be smart and go to school, become a lawyer, so you can help other families."

lead a better life than she did and to have hope for the future.[19] She taught him how to spell his name over the course of many visits. When he became impatient or distracted, she deferred to his five-year-old attention span and ended calls to enable him to play or eat dinner. And within the constraints of their video interactions, she also set limits for him.[20]

The logs also reflect J.D.'s attachment *to mother*. To start, they reveal that J.D. refers to mother as his "mommy"—a word the juvenile court observed was "throughout" the exhibit. In addition, J.D. frequently exhibited affection toward mother during visits. He frequently told her that he loved her. One time, he blew her kisses. He told her she was pretty. And that she was his "favorite." And in several visits, including his last, he told her he missed her.

J.D. also frequently expressed a desire to go to mother's house, right up to his last recorded visit with her—including one time in tears ("I wanna come over? Coronavirus is over, I wanna come over"), another time practically begging ("pretty please?"), and another time saying it was at the top of his Christmas list. In many of these instances, he saw his sister visiting with mother and didn't understand why he couldn't be there too.

---

[19] For example, in one visit when he sang a song to her he had just learned in church, mother was moved to tears and told him to believe in the song, to be good and to listen and he would get blessings, adding, "You gotta do better than mommy." Another time, she told him she wanted him to be close with his sister, love her and look out for her as he gets older, and "be better than me and my sister."

[20] For example, one time before their visit began he got in trouble for looking under a child's dress, and so she declined to let him have a cupcake despite his begging and also told him his behavior had been inappropriate. Another time she spoke to him about misbehaving at school. Another entry noted mother "always tell[s] J.D. what's right and wrong when talking to him."

J.D. also frequently asked mother details about her home, including about "his" room there. And he told her during one visit, "you should moved [*sic*] in our house mommy[]."

J.D. also frequently sought mother's attention during visits. For example, he showed off his toys to her, his Christmas tree and his clothes. He launched into song for her and ended one visit by doing dance moves for her. He frequently initiated conversations with her ("guess what coming up, mommy [?], Halloween"), frequently volunteered information about himself (such as telling her he had a good day at daycare) and also had "a lot to share" with her on the subject of video games. One time, he even "walk[ed] around the house with the tablet showing everyone in the house that he's talking to his Mom."

Their visits also reflected many intimate moments and exchanges. During one visit, she told him she had seen an airplane take off for the first time in her life; they had an exchange about massaging each other's feet; and he told her he had been having scary dreams, which she told him are called nightmares. In several visits, he told her about his loose baby teeth. Sometimes he wanted her to feed him, one time asking her to make a peanut butter and jelly sandwich for him and her "magic" juice, and another time, while she was cooking, told her to save some food for him. He volunteered to her that he didn't know how to ride a bike. In their visits, they made each other laugh. He was happy. He wanted to spend time with her (telling her one time, for example, he wanted to go "now" to visit the Pumpkin Patch with her). He asked about her life. He told her what was in his prayers. And one time, talking to her while riding home in the car, he told her about the moon.

The agency argues that J.D.'s references to wanting to go to mother's house, read in isolation, are susceptible to the inference that he merely "felt

29

left out" because he sometimes saw his sister there and also just wanted to play with toys that he saw in mother's home. But that inference cannot be reconciled with J.D.'s many expressions of affection toward mother during their visits (including telling *her* to move in with *him*), as well as the rest of what those visits portray.

The agency also argues there was competing evidence in the logs, which the juvenile court was entitled to credit, that J.D. "was not enthusiastic about visits." We do not agree. It cites two instances in which J.D. became distracted by his video game, one in which he asked for a break, and another that ended early so he could play with his cousin after walking away from the video screen for several minutes. As mother argues, however, these few instances merely reflect the challenges of virtual visitation with a five-year-old child who has a limited attention span and likes to play. On another occasion, C.J. told mother he'd had a bad day at school and had just turned off his computer and told the teacher he didn't want to work that day. Judged in light of the entire record of visits, the few isolated instances in which J.D. became distracted do not detract from the countless moments in which he actively engaged with mother during their virtual visits, on matters both trivial and significant, was happy to see her, shared five-year-old intimacies with her, expressed love and affection toward her and a desire to see more of her, at her own home and in person. Indeed, the social worker acknowledged J.D. looked forward to his visits. And before in-person visitation was suspended, C.J. reported he was always happy when he returned from seeing his mother.

In arguing mother did not prove the second element, the agency stresses evidence that J.D. looked to C.J., not mother, for comfort, support, structure and to meet his needs, and it also notes evidence that in an

30

interview with his attorney prior to the 18-month review hearing (which took place in August 2020, about five months before the section 366.26 hearing), J.D. said, "I want to be [C.J.'s] son." But such evidence does not preclude a finding he had a significant positive attachment to mother. In proving the existence of a beneficial relationship, mother was not required to prove that J.D.'s attachment to her was his primary bond. (*S.B.*, *supra*, 164 Cal.App.4th at p. 300.) A child's emotional attachments are not a zero-sum game. "We do not believe it is reasonable to require the parent of a child removed from parental custody to prove the child has a 'primary attachment' to the parent . . . ." (*Id*. at p. 299.) As reflected by decisions cited favorably in *Caden C.*, the exception can apply even when a child has bonded to an alternative caretaker. (See, e.g., *In re Scott B.* (2010) 188 Cal.App.4th 452, 473 [reversing order terminating parental rights, and noting minor "clearly needs both of his mothers—his biological mother and his foster mother"], cited in *Caden C.*, *supra*, 11 Cal.5th at pp. 632, 634, 638; *S.B.*, *supra*, 164 Cal.App.4th at p. 300 [reversing order terminating parental rights even though child had "strong, positive and significant relationship with her grandmother"], cited in *Caden C.* at pp. 632, 633; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690 (*Amber M.*) [reversing order terminating parental rights even though nearly five-year-old child was attached to grandfather who wanted to adopt him], cited in *Caden C.*, at pp. 630, 634, 638.) Nor is it a question of "comparing the parent's attributes as a custodial caregiver relative to those of any potential adoptive parent(s)," because "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C.*, at p. 634.) Mother was not J.D.'s primary caretaker, and the quality of J.D.'s attachment to her must be evaluated in the context of the contact she was permitted to have with him

31

during the course of the dependency proceeding.  (See *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537-1538 (*Brandon C.*).)

Furthermore, J.D.'s statement to his attorney five months before the section 366.26 hearing tells only half the story.  The other half has been obscured by the social worker's failure ever to ascertain how J.D. felt about his mother and about the prospect of never seeing her again.  Although J.D.'s attorney evidently had no trouble asking J.D. where he wanted to *live*, the social worker essentially took the position it was age-inappropriate to explore the more general subject of J.D.'s feelings towards his mother, which, at least in the context of the beneficial relationship exception, was equally or more important.

Moreover, in evaluating the record, we cannot overlook the fact the agency provided very little information in its reports, including the pivotal section 366.26 report that recommended terminating mother's parental rights, about the quality of mother's relationship with J.D. or even the nature of her interactions with him during visitation.  That was not appropriate and did a disservice to not just mother and J.D. but also the juvenile court.  (See *Amber M., supra,* 103 Cal.App.4th at p. 690 [criticizing "perfunctory" evaluation of mother's relationship with children that "instead focus[ed] on her current inability to provide a home for them and the suitability of the current placements, perhaps swayed by [relatives'] qualifications and willingness to adopt and their refusal to consider guardianship or any other permanent plan"]; *Brandon C., supra,* 71 Cal.App.4th at p. 1538 [evidentiary analysis concerning beneficial relationship exception that faults social services agency for failing to provide information about the quality of mother's visitation; "[i]ts reports consistently described the regularity of the

32

visits, with no evaluation of their success"]; see also *B.D.*, *supra*, 66 Cal.App.5th at p. 1230, fn. 5; *In re B.D.*, *supra*, 35 Cal.App.5th at p. 822.)

As *Caden C.* reflects, the existence of a parental bond is contextual. No two families are alike, and no two dependencies are alike. Here, the juvenile court was faced with a (then) five-and-a-half-year-old child who had spent the last two years of his life living apart from his mother with someone who clearly loves him too; and a young mother, herself a former foster youth, who was parentless all her life and had little, if any, positive parental role modeling. She tried very hard and she responded favorably to family intervention even though she was not able, ultimately, to reunite with her son. And despite the fact that mother and J.D. were separated for two years, and for ten months of that time had *no* in-person physical contact with each other because of an unprecedented global health crisis (a period that to the child would likely have seemed an eternity), their visits were, on the whole, overwhelmingly positive. "We can all appreciate now, in the midst of the COVID-19 [pandemic], that video meetings are not an adequate substitute for meeting in person, even for adults. That's even more true for children . . . ." (*In re S.S.* (2020) 55 Cal.App.5th 355, 377.) Given these circumstances, it is hard to imagine what a positive, emotional attachment by a child to his non-reunifying parent looks like if not this.

Were it not for evidence that mother was sometimes prone to bad-mouthing C.J. and, particularly early on, threatening her and undermining her caregiving efforts, the evidence we have discussed would compel a determination that mother proved the existence of a beneficial relationship as a matter of law. Indeed, decisions cited with approval in *Caden C.* have relied on evidence similar to that we have described in holding the beneficial relationship exception satisfied, including as a matter of law. (See, e.g., *S.B.*,

*supra*, 164 Cal.App.4th at pp. 298-299 [finding that father lacked a parental relationship held unsupported by evidence where, inter alia, he was child's primary caregiver for three years, child continued to display strong attachment to father as evidenced by conduct such as sitting on his lap during visits and "proudly" displaying shoes he bought her, initiating physical contact, whispering and joking with him, saying "I love you" and making other statements indicating she wanted their relationship to continue], cited in *Caden C.*, *supra,* 11 Cal.5th at pp. 632, 633; see also *Amber M.*, *supra,* 103 Cal.App.4th at pp. 689-691 [reversing order terminating parental rights], cited in *Caden C.*, at pp. 632, 633; *Brandon C.*, *supra,* 71 Cal.App.4th at pp. 1535-1538 [affirming application of the exception and upholding order selecting guardianship rather than adoption as child's permanent plan], cited in *Caden C.*, at pp. 632, 634, 639-640.) Although there was also a bonding study or other expert opinion in several of these authorities (see *S.B.*, *supra*, 164 Cal. App. 4th at pp. 295-296 [bonding study]; *Amber M.,* at pp. 689-691 [opinion of CASA and five-year-old child's therapist]), such evidence, while "an important source of information" (*Caden C.*, at pp. 632-633), is not required as a matter of law (and the agency acknowledged this at oral argument). The Supreme Court has instructed trial courts to "seriously *consider*, where requested *and appropriate*, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4, italics added.) Here, no such study was requested. However, in addition to the other evidence we have discussed, the record contains C.J.'s views about mother's relationship with J.D. and about the importance of allowing them to have continued contact. Such views by a child's long-term caretaker provide objective, third-party evidence of the parental bond and are sufficient to establish the exception in an appropriate case, even in the absence of

34

professional opinion. (See *Brandon C.*, at pp. 1536-1537 [discussing evidence of grandmother's opinions].)

Having said of all of this, the analysis here is complicated by evidence of mother's struggles with reactivity and managing her anger. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 637-638.) Throughout the dependency, mother at times engaged in behavior that was decidedly not appropriate, which the juvenile court could infer had a negative impact on J.D. As the agency notes, she attempted to undermine J.D.'s placement with C.J. in various ways such as instructing him not to listen to C.J. , teaching him to call her names, telling him to lie about getting hit by C.J.'s sister, threatening C.J. and her family in person and on social media, and making unsupported claims to the agency about C.J.'s unfitness as a caregiver. *Caden C.* explicitly recognized that a parent's efforts to undermine a child's foster placement "could certainly have had a negative effect on [the child]." (*Caden C.*, at p. 637.)

But we find nothing in the record indicating that mother's behavior had a *lasting* impact on J.D. But for a vague comment by J.D. to his attorney five months before the section 366.26 hearing in August 2020 (see footnote 13, *ante,* p. 12), the only evidence in the record is that these things occurred earlier in the case (no later than around March 2020, almost a year before the section 366.26 hearing). Moreover, the record indicates that mother's problematic behavior was fully resolved by the time of the section 366.26 hearing. There is no indication that J.D.'s behavioral issues noted in daycare in early 2020 ever recurred, and in the section 366.26 report the agency said C.J. "has said [J.D.] has been doing great and has not seen any concerning behaviors from him." C.J.'s opinion is bolstered by the four months of visitation logs, which contain a number of entries in which mother told her son to be "good," including one where she explicitly told him to be "good and

listen to Grandma." In the visits, mother also deflected some of his entreaties to go home with her by reassuring him that C.J. loves him too. The section 366.26 report noted no concerns about J.D.; on the contrary, it described him as "developmentally on target" and described C.J. as having "shown she is very capable of meeting all [J.D.'s] basic needs." It also said that "cordial" relations had been restored between mother and C.J., who "wants [J.D.] to have a decent relationship with [mother]" and "wants her to be a part of his life growing up."

The record contains no assessment of the overall impact mother's past behavior had on J.D., which appears to be negligible at best. However, because neither the parties nor the court had the benefit of *Caden C.*, we deem it prudent to remand for a new section 366.26 hearing at which such questions may be considered.

That result also is appropriate because we cannot be certain the juvenile court did not rely on improper factors in assessing this element. In closing arguments, which were brief, neither the agency's counsel nor counsel for J.D. (who concurred in the agency's recommendation) addressed whether J.D. had an emotional attachment to mother, and they both alluded to factors deemed irrelevant in *Caden C.* The agency argued mother's visits were still supervised, erroneously implying the court could consider the mere fact she had been unable to succeed in overcoming her parenting struggles as a reason to rule against her, regardless of whether or how her son was affected by those shortcomings. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 637-638.) J.D.'s counsel emphasized the fact that J.D. views C.J.'s home, not mother's, as his home, thus erroneously inviting the court to consider the suitability of his current placement in deciding whether to terminate mother's parental

36

rights.[21]  As noted, however, application of the beneficial relation exception is not a contest between two potential custodial caregivers.  (See *Caden C.*, at p. 634; see also *B.D.*, *supra*, 66 Cal.App.5th at p. 1299 [remanding for new section 366.26 hearing where, inter alia, juvenile court relied on evidence that children looked to grandmother to meet their daily needs].)  Moreover, the juvenile court was apparently swayed, at least in part, by such considerations.  It expressly noted that "[J.D.] wants to have permanency with [C.J.]"—apparently a reference to J.D.'s statement he wanted to be C.J.'s "son" (which shed no light on his relationship with mother in this case)—and it terminated parental rights based on "all the evidence presented" including "the length of the relationship between [J.D.] and [C.J.]."  J.D.'s attachment to C.J. was certainly relevant to a determination to designate her as J.D.'s prospective adoptive parent; but it had no place in the court's antecedent assessment as to whether terminating mother's parental rights and selection of adoption as J.D.'s permanent plan was appropriate, in light of the nature of mother's relationship with J.D.

Moreover, as mother pointed out at oral argument, the juvenile court's finding on the second element was conclusory and thus problematic—that mother's relationship with J.D. did not "amount to a parental bond." *Caden C.* did not address whether, to satisfy the second element, the nature

_____

[21]  She argued:  "[H]e has expressed that he does want to be with [C.J.] as his permanent home, and that's how he views her.  And I do believe it is in his best interest to be adopted by her and be given permanency. [¶] Regarding mother's arguments regarding the visits, . . . the notes do not indicate that my client has asked to return to the home of the mother.  He's asked to come over as one would with referring to not your home.  You want to come over to somebody else's home.  He says, 'I want to come to your house, mommy,' because he views [C.J.]'s house as his house, and he has been there for now over two years."

of a parent's relationship must be "parental," a descriptor the Supreme Court did not use and that, standing alone, is vague and unhelpful in this context. *Caden C.* said only that the child must have a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship" (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see also *id.* at p. 640 ["whether the relationship is such that the child would benefit from continuing it"]; *id.* at p. 633 [second element addresses "the psychological importance of the relationship for the child"].) Such a relationship is surely more significant than that of a "mere friend or playmate." (*B.D.*, *supra*, 66 Cal.App.5th at p. 1230.) But, as we have discussed, the Supreme Court made clear that more than one person can occupy an important, emotional role for a child even if one—the non-reunifying parent—is incapable of providing for the child's everyday needs and well-being. Moreover, *Caden C.* also made clear that the type of relationship necessary to establish the exception is not narrowly defined or specifically identifiable, because parent-child relationships are endlessly varied. (See *id.* at p. 632.) Here, then, we cannot be sure whether the juvenile court's determination that mother did not occupy a "parental" role encompassed factors that *Caden C.* deems irrelevant. (See also *B.D.*, at p. 1230 [expressing concerns with juvenile court's references to whether parents occupied a "parental role" or whether a "parental relationship" existed].) Or, put another way, the court appears to have applied the wrong legal standard under *Caden C.* in evaluating the second element. Indeed, the juvenile court found that mother's relationship with J.D. was a "positive" one, which begs the question whether the court also considered it to be a "*substantial*, positive, emotional attachment" notwithstanding that J.D. looked to C.J. to meet his daily needs.

## B. Balancing the Harm of Severing the Parent/Child Relationship Against the Benefits of Adoption

Because it is unclear whether and to what extent the juvenile court considered improper factors at the second step of its analysis, it is unnecessary to address whether there also was an abuse of discretion at the third step. That is, in weighing the harm of severing mother's parental relationship with J.D. against the benefits of providing him with a permanent adoptive home. (*Caden C.*, *supra,* 11 Cal.5th at p. 632; see *B.D.*, *supra*, 66 Cal.App.5th at pp. 1230-1231.) Nevertheless, we also have a concern as to whether the court considered improper factors in assessing this third element. Thus, for guidance on remand, we would be remiss not to explain it.

Under the third step of the analysis, the juvenile court must undertake a "subtle, case-specific inquiry": namely, "does the benefit of a placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Caden C.*, *supra,* 11 Cal.5th at p. 633.) *Caden C.* explained in some depth the subtleties often involved in this "crucial" aspect of the analysis, particularly in a case such as this which involves "tangled benefits and burdens"—that is, a relationship with negative aspects as well as positive ones. (See *id*. at pp. 631, 634-635.) "To gauge and balance these weights can be a daunting prospect for trial courts." (*Id*. at p. 635.) "But it's what the statute requires . . . ." (*Ibid*.) It is the final step in a "carefully calibrated process" intended to "protect[] the parent and child from an overhasty termination of their relationship while ensuring that the child is expeditiously placed in a safe and stable home." (*Id*. at p. 625.)

Extended discussion of the third element is unnecessary. The Supreme Court made clear, among other things, that the juvenile court engaged in this

challenging weighing task is not permitted to consider the possibility of any post-adoption contact between parent and child. "Because terminating parental rights eliminates any legal basis for the child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in a new adoptive home *without the parent in the child's life*." (*Ibid.*, italics added.) As explained in authority the court cited favorably, "[t]he purpose of the parent-child relationship exception is to protect the parent-child relationship when its continuation is more beneficial to the dependent child than a permanent plan of adoption and, in such case, a court cannot leave the protection of such a relationship dependent upon the hoped for goodwill of the prospective adoptive parents." (*In re C.B.* (2010) 190 Cal.App.4th 102, 128-129, cited in *Caden C.*, at p. 633.) In short, the juvenile court must assume that if it decides to sever parental rights, then parent and child will be left as not just legal strangers to one another but also literal strangers.

Yet here, as reflected by some of its evidentiary rulings, the juvenile court appears to have assumed the opposite. This was illustrated most pointedly in a colloquy during cross-examination of the social worker:

"[MOTHER'S COUNSEL]: Mr. Reynoso, you're trained to speak to a five-year-old in an age-appropriate manner, correct?

"A. Yes.

"Q. And so . . . were you able to ask [J.D.] in an age appropriate manner for his age how he felt if he was not able to see his mother again?

40

"[AGENCY'S COUNSEL]: You're Honor, I'm going to object as that assumes facts not in evidence. At no point has evidence been given that there will be no contact.

"THE COURT: I'll sustain.

"[MOTHER'S counsel]: Your Honor, we're not sure if visits will continue if . . . adoption is . . . the Court's order.

"THE COURT: I'm going to sustain the objection based on how you asked that question. Sustained."

The juvenile court's assumption that termination of parental rights would not necessarily cut off all contact between mother and J.D. also was reflected, more subtly, when the social worker was cross-examined about C.J.'s preference for adopting J.D. rather than serving as his legal guardian:

"[MOTHER'S COUNSEL]: Q. Mr. Reynoso, have you ever talked to [C.J.] about guardianship?

"A. I have talked to her about both guardianship and adoption and permanent—I talked to her about a permanent plan in general, yes.

"Q. And so given your assessment, your monthly assessment and [C.J.]'s expressed intent that [J.D.] remain in . . . his mother's life, was guardianship not considered for [C.J.]?

"A. Yes, it was not considered.

"Q. And did she give a reason why it was not considered over adoption?

"A. She preferred adoption.

"Q. Did she state why?

"A. Not specifically. She just stated she was always a hundred percent committed and wanted to move forward, and there was never any hesitation on her part.

41

"Q.  So did you explain to her during your monthly meetings that with adoption . . . there would no longer be a relationship for [J.D.] and his mother?

"[AGENCY'S COUNSEL]:  Objection.

"THE COURT:  That's sustained.  That's not necessarily true, [mother's counsel].  So I will sustain that objection.

"[MOTHER'S COUNSEL]:  Q.  I'll rephrase the question.  Did you explain to [C.J.] that it would not be a legal relationship between [J.D.] and his mother after adoption?

"A.  Yes.

"Q.  And . . . with that explanation, did [C.J.] give you a response?

"A.  She—all long she was pretty committed from the very beginning to adopting [J.D.].

"Q.  Did you—I mean do you understand the inconsistency with her intention to keep [J.D.] in the life of his mother?

"THE COURT:  I'm sorry.  I didn't understand one of the words.  I couldn't hear you, [mother's counsel].  Can you rephrase.

"[MOTHER'S COUNSEL]:  Q.  Your assessment and [C.J.]'s expressed intent is inconsistent with that, is it not?

"[MINOR'S COUNSEL]:  I would object to that question.

"THE COURT:  I'm going to sustain.  I'll sustain that objection."

The juvenile court's assumption, as reflected in these rulings, that post-adoption contact was not necessarily precluded is understandable as a practical matter.  But as a legal matter, such considerations must be put aside in assessing whether a child would be harmed by the loss of a significant, positive emotional relationship with a natural parent to such a degree that it is the child's best interest to select some permanent plan short

42

of adoption. Because the record reflects the court did not put such considerations aside when it ruled on several evidentiary objections, we cannot be certain it properly evaluated the evidence when it came time to render its ultimate decision to terminate mother's parental rights.

## C. Conclusion

For guidance on remand, we offer two additional observations.

First, we are troubled by the agency's failure in the later stages of the case to consider guardianship as an alternative to adoption given even C.J.'s desire that mother remain in J.D.'s life (an option the agency apparently was open to early on). The social worker simply deferred to C.J.'s preference for adoption over guardianship, without question. We can infer C.J. harbored some lingering discomfort with mother, but there had been no negative incidents between them for nearly a year (since March 2020) and the section 366.26 report described their relationship as "cordial" in the end. The social worker's adoption recommendation might well have presented the path of least resistance. But it surely does not appear to have been the product of much deliberation.

We also note that some of the agency's later criticisms of mother stemmed from the fact she sometimes mentioned her financial pressures to J.D. There is no evidence such comments caused J.D. any anxiety or were in any other way detrimental to him, however. And we cannot simply presume that they were. The dependency scheme does not legislate parenting styles, and a parent might well believe that discussing financial hardship openly with children, even from a young age, could be beneficial for any number of reasons (such as minimizing shame, for example, fostering resilience, promoting financial responsibility, or simply exposing a child to the vicissitudes of life). That is true of any parent, whether wealthy, middle-

43

income, low-income or destitute.  Mother's transparency to J.D. about her poverty is no more a reason for criticism than was her homelessness. " '[I]ndigency, by itself, does not make one an unfit parent and "judges [and] social workers . . . have an obligation to guard against the influence of class and life style biases." ' " (*In re S.S., supra,* 55 Cal.App.5th at p. 373; see also, e.g., *In re P.C.* (2008) 165 Cal.App.4th 98, 103-107.)

We thus end where *Caden C.* began its analysis:  with a recognition that consideration of the beneficial relationship exception is a "fraught determination" that requires the juvenile court to "sift through often complicated facts to weigh competing benefits and dangers for the child[,] . . . consider practical realities over which it has limited control and envision a child's future under contingent conditions." (*Caden C., supra*, 11 Cal.5th at p. 625.)  Here, the facts indeed are complicated.  This is not an easy case.  But lest one former foster youth who grew up to become a troubled (albeit loving) young adult beget another, the juvenile court must carefully examine the relationship between this mother and son consistent with *Caden C.,* to decide whether their relationship is of such a nature that it is in the child's best interests for that relationship to endure.

## DISPOSITION

The order terminating mother's parental rights is reversed and the matter is remanded for the juvenile court to conduct a new section 366.26 hearing consistent with *In re Caden C.* (2021) 11 Cal.5th 614 and the views expressed in this opinion.  The parties may introduce such additional relevant evidence as they deem necessary, including but not limited to evidence of the family's current circumstances and any developments that might have occurred during the pendency of this appeal.

                                              _____
                                              STEWART, J.

We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.


*In re J.D.* (A161973)

45

Trial Court: San Francisco County Superior Court

Trial Judge: Hon. Susan M. Breall

Counsel:

Rachel Belden and Amy Grigsby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dennis J. Herrera, City Attorney, Kimiko Burton, Deputy City Attorney; Gordon-Creed, Kelley Holl and Sugerman, Jeremy Sugerman, for Plaintiff and Respondent.